UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| COLEMAN JARRETT, et al. ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No. 1:12-cv-00064-SEB-DML |
| ) | |
| WRIGHT MEDICAL TECHNOLOGY, INC., ) | |
| ) | |
| Defendant. ) | |

**ORDER ON MOTIONS TO EXCLUDE EXPERT TESTIMONY**

Plaintiffs Coleman and Paula Jarrett commenced this action in 2012 as part of a multidistrict litigation styled "CONSERVE® Hip Implant Product Liability Litigation, MDL 2329," pending before the United States District Court for the Northern District of Georgia. This case, relating to Mr. Jarrett's receipt of hip implant components from Defendant Wright Medical Technology Inc.'s ("Wright Medical") CONSERVE® product line during a July 17, 2006 left total hip arthroplasty, was remanded and transferred to our court to proceed individually on July 6, 2018. Plaintiffs allege that, based on purported defects in the CONSERVE® devices generally relating to alleged design defects that Plaintiffs claim caused excessive metal ion release and loosening of the CONSERVE® Cup device, Mr. Jarrett was forced to undergo a second "revision" surgery on July 12, 2010 to remove the CONSERVE® devices.

Now before the Court are Defendant's Motions to Exclude the Expert Testimony of John I. Waldrop, M.D. [Dkt. 80] and John D. Jarrell, Ph.D., PE [Dkt. 81], who have been retained by Plaintiffs to testify regarding the alleged propensity of the metal-on-

1

metal design of the CONSERVE® products to generate high levels of metal ion release allegedly resulting in the loosening and early failure of the implant.  Defendant moves, pursuant to Federal Rules of Evidence 702 and 703 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to exclude the expert testimony of Drs. Waldrop and Jarrell on various grounds.  Plaintiffs oppose these motions.  For the reasons detailed below, we <u>GRANT IN PART</u> and <u>DENY IN PART</u> Defendant's Motions to Exclude.

## **Applicable Legal Standard**

The admissibility of expert testimony is governed by the framework set out in Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579 (1993).  *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).  Applying this framework, courts must undertake:

> a three-step analysis: the witness must be qualified "as an expert by knowledge, skill, experience, training, or education"; the expert's reasoning or methodology underlying the testimony must be scientifically reliable; and the testimony must assist the trier of fact to understand the evidence or determine a fact in issue.

*Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007) (quoting Fed. R. Evid. 702) (internal citations omitted); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999) (extending the *Daubert* admissibility framework to expert testimony in the social sciences).  "The *Daubert* standard applies to all expert testimony, whether it relates to an area of traditional scientific competence or whether it is founded on engineering principles or other technical or specialized expertise."  *Smith v. Ford*

*Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000) (citing *Kumho*, 536 U.S. at 141).  The burden is on the proponent of the expert to demonstrate that the expert's testimony would satisfy the *Daubert* standard.  *Lewis*, 561 F.3d 705.

## Discussion

### I.    Expert Testimony of Dr. Waldrop

John I. Waldrop, M.D. is an orthopedic surgeon whom Plaintiffs have identified as an expert to offer opinions concerning "the implantation and failure of the Wright Medical CONSERVE® Total Hip Implant Device associated with" Mr. Jarrett.  Waldrop Rep. at 1.  Dr. Waldrop has been practicing medicine for 40 years, maintaining an active practice performing hip and knee arthroplasties.  He estimates that he has performed more than 5,000 to 6,000 total hip procedures and, since 2010, has revised 64 hips, many of which were metal-on-metal implants, including five to ten CONSERVE® devices.

Dr. Waldrop's general causation report discusses five general "characteristics" of metallosis[1] caused by metal-on-metal hip implants that he has observed in his practice: (1) discolored fluid in the joint; (2) "death or necrosis of local tissue in the hip area"; (3) "cystic responses" or pseudotumors; (4) other tissue reactions including inflammation, discoloration, and staining; and (5) elevated cobalt and chromium levels.  His expert report includes photographs of hip replacement revision surgeries involving ten unidentified patients from his practice, none of whom is Mr. Jarrett.  There is no

---

[1] Metallosis is a blood poisoning condition that develops as a result of having high levels of toxic metals in the blood.

3

information included in Dr. Waldrop's report regarding the manufacturer of the hip implant components depicted in the photographs, the medical backgrounds of the patients, the implanting surgeons, or any other background information regarding the surgeries.  Dr. Waldrop testified that he is "[p]retty sure at least one" of the devices depicted in the photographs is a Wright Medical CONSERVE® device, but that he is unable to identify which of the depicted devices were manufactured by Wright Medical. Waldrop Dep. at 67–68.

With regard to Mr. Jarrett's case specifically, Dr. Waldrop states that he "examined the medical records of Coleman Jarrett including digital x-rays of his prothesis," and based on his review of these materials and his education, training, and experience, he has formed the opinion that the failure of Mr. Jarrett's CONSERVE® total hip implant "was due to the pain associated with metallosis, corrosion, and component loosening associated with metal-on-metal hip failures," that the findings during Mr. Jarrett's revision surgery "including the noted pseudotumor, corrosion, and other indicative findings of a metallosis reaction are consistent with [his] own clinical findings on revision of metal-on-metal prosthesis," and that Mr. Jarrett's "pain prior to the revision, necessity of the revision, and injuries after the revision are the result of the defective metal-on-metal prosthesis."  Dr. Waldrop further opines that Mr. Jarrett likely will experience future injuries, including the potential for an additional revision surgery, and that the medical billing for Mr. Jarrett's July 12, 2010 revision surgery was reasonable.

Wright Medical seeks to have Dr. Waldrop's general and specific causation opinions excluded because "they are not scientifically derived or based on any reproducible test, and [they] lack fit with this case." Dkt. 82 at 1. Additionally, Wright Medical argues that Dr. Waldrop's testimony regarding Mr. Jarrett's potential future injuries is too speculative to be admissible and that his testimony regarding the reasonableness of Mr. Jarrett's medical bills should be excluded because he lacks any special knowledge in the area of billing to support such an opinion. We address these arguments in turn below.

### A.     General Causation Opinions

First, Wright Medical argues that Dr. Waldrop's general causation opinions concerning other patients and other manufacturers' medical devices, including his use of and reference to photographs of other patients and devices, should be excluded because they are not sufficiently tied to the facts of this case. We agree with Defendant that the details of the photographs (their source and origin and the unspecified connection between them and this litigation) defeats their relevance. Dr. Waldrop's report depicts revision surgeries of unknown patients and devices other than the CONSERVE® devices at issue. Even if relevant, the prejudicial effect and potential to confuse jurors would likely outweigh the substance of these photographs. Accordingly, any photographs depicting devices other than the CONSERVE® device at issue shall be excluded. However, Dr. Waldrop's general causation testimony in its entirety is not inadmissible.

5

One of Mr. Jarrett's primary allegations in this case is that the CONSERVE® device's metal-on-metal design is defective, and Dr. Waldrop, an experienced and qualified orthopedic surgeon who has performed approximately 65 metal-on-metal revision surgeries, including several involving CONSERVE® devices, will be called to testify as to his general observations regarding medical issues involving such revisions. Given Dr. Waldrop's extensive experience, such testimony, which we understand to apply to all metal-on-metal devices in general including the CONSERVE® devices at issue, is thus "sufficiently reliable, and will assist the trier of fact in understanding the evidence in this case and to determine the issue of causation." *In re Wright Med. Tech. Inc., Conserve Hip Implant Prods. Liab. Litig.*, 127 F. Supp. 3d 1306, 1337 (N.D. Ga. 2015) (admitting Dr. Waldrop's testimony in hip implant products liability litigation); *accord Morris v. Biomet, Inc.*, ___ F. Supp. 3d ___, 2020 WL 5849482, at *6 (D. Md. Sept. 30, 2020). Accordingly, Dr. Waldrop will be permitted to testify as to his general observations regarding metal-on-metal revisions but may not rely on or reference photographs of unknown patients depicting devices other than Wright Medical's CONSERVE® hip system to illustrate or otherwise support his testimony. Wright Medical will, of course, be free to challenge Dr. Waldrop's credibility or the substance of his general causation opinions through cross examination and appropriately interposed objections at trial.

    **B.**     **Specific Causation Opinions**

Wright Medical also seeks the exclusion of Dr. Waldrop's specific causation opinions on grounds that they are connected to Mr. Jarrett's particular presentation by nothing more than the *ipse dixit* of the expert and must therefore be excluded. *See Clark v. Takata Corp.*, 192 F.3d 750, 758 (7th Cir. 1999) (holding that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert" and "[w]here the proffered expert offers nothing more than a 'bottom line' conclusion, he does not assist the trier of fact" and his opinions should be excluded). Plaintiffs rejoin that Dr. Waldrop's conclusion that Mr. Jarrett's hip revision was necessary "due to pain associated with metallosis, corrosion, and component loosening associated with metal-on-metal hip failures," is based, not on *ipse dixit*, but on a properly conducted differential diagnosis and is thus admissible under *Daubert*.

The Seventh Circuit has held that a differential diagnosis "is an accepted and valid methodology for an expert to render an opinion about the identity of a specific ailment." *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010). To conduct a differential diagnosis, "the doctor rules in all the potential causes of a patient's ailment and then by systematically ruling out causes that would not apply to the patient, the physician arrives at what is the likely cause of the ailment." *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 433 (7th Cir. 2013) (quoting *id.* at 641). "Under *Daubert*, expert opinions employing differential diagnosis must be based on scientifically valid decisions as to which potential causes should be 'ruled in' and 'ruled out.'" *Ervin*, 492 F.3d at 904.

7

Here, while admittedly a close question, we find that Dr. Waldrop's specific causation opinions are admissible as the fruits of a sufficient differential diagnosis following his review of Mr. Jarrett's medical records, which included the post-operative report prepared by Mr. Jarrett's orthopedic surgeon, Dr. Parr, following the revision surgery, as well as x-rays and other imaging and testing. In reaching his conclusion, Dr. Waldrop relied primarily on Dr. Parr's observations following Mr. Jarrett's revision surgery, including Dr. Parr's description of discolored fluid at revision, erosion of the posterior wall and posterior superior part of the acetabulum, and diagnosis of a pseudotumor related to metal-on-metal articulation. And in his report, Dr. Waldrop opines, based on the experience, training and knowledge he has acquired in practicing orthopedics for over 40 years, his observation of surgeries for the removal of cobalt and chromium metal-on-metal hip implants, the revisions of cobalt and chromium hip implants, and conversations and presentations by other orthopedic surgeons, that such findings are consistent with metallosis and related problems associated with metal-on-metal hip systems.

Dr. Waldrop also appears to have considered and eliminated at least a few alternative causes of the loosening and failure of Mr. Jarrett's explanted device, including its positioning and placement by Dr. Parr, the possibility of infection, and potential trauma, concluding that there were no signs of infection and that the CONSERVE® device was properly placed, had remained tightly affixed for several years, and would not have loosened as a result of incidental trauma. This methodology passes scrutiny under

8

*Daubert.*² Although Wright Medical points out several causes Dr. Waldrop failed to consider or failed to provide reasons for discounting, an expert need not eliminate all potential alternative causes for his differential diagnosis. Any such perceived insufficiencies in Dr. Waldrop's testimony can be addressed through vigorous cross-examination as it is well-established that the "soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact …." *Smith*, 215 F.3d at 718.

### C. Testimony Regarding Future Injuries

Wright Medical next seeks to have excluded as speculative Dr. Waldrop's testimony that Mr. Jarrett "likely will experience future injuries including the potential for an additional revision surgery due to the titanium Profemur neck that remains unrevised." Rep. at 2. In reaching this conclusion, Dr. Waldrop relies on statements from Mr. Jarrett's deposition regarding current pain in his hip and back, coupled with knowledge that the PROFEMUR® titanium neck device that is still implanted in Mr. Jarrett "has some history of fractures." Waldrop Dep. at 152.

However, Dr. Waldrop conceded at his deposition that he has no information regarding Mr. Jarrett's current condition with respect to his left hip, whether he has any treatment planned, or any information regarding the current performance of Mr. Jarret's

---

² We acknowledge that several answers given by Dr. Waldrop at his deposition regarding the basis for his specific causation opinions veer toward *ipse dixit*, which we assume will be areas ripe for inquiry on cross-examination. However, Dr. Waldrop's testimony is not so utterly lacking and superficial that it can provide no reliable basis for an opinion on causation.

9

PROFEMUR® titanium neck device, and thus has no way to know "for sure" whether he will need to undergo undergo another revision surgery on his left hip. *Id.* at 151–52. Given these admissions, we must conclude that Dr. Waldrop's opinions regarding Mr. Jarrett's future injuries are too speculative to be considered reliable and are therefore excluded on that basis. *See Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 816 (7th Cir. 2004) ("A court is expected to reject any subjective belief or speculation.") (quotation marks and citation omitted).

### D. Testimony Regarding Reasonableness of Medical Billing

Finally, Wright Medical seeks to have excluded Dr. Waldrop's opinion regarding the reasonableness of the medical billing in Mr. Jarrett's case. When asked at his deposition, Dr. Waldrop conceded that he does not know the amount Mr. Jarrett is claiming in terms of medical bills in this case and that he "has no involvement in medical billing in his own practice." Waldrop Dep. at 150. Based on these admissions, it is clear that Dr. Waldrop lacks specialized knowledge in the area of medical billing that would assist the jury in determining whether Mr. Jarrett was billed a reasonable amount for his medical treatment nor can we find that Dr. Waldrop's testimony is the result of reliable principles and methods in this area. Accordingly, his testimony regarding the reasonableness of Mr. Jarrett's medical bills must be excluded.

In conclusion, for the foregoing reasons, Defendant's motion to exclude Dr. Waldrop's testimony is granted in part and denied in part. Dr. Waldrop may testify as to his opinions regarding general and specific causation, but his testimony regarding Mr.

Jarrett's potential for future injuries and the reasonableness of his medical bills is excluded.

## II. Expert Testimony of John D. Jarrell, Ph.D., PE

Wright Medical also seeks to have excluded the opinions and testimony of John D. Jarrell, Ph.D., PE regarding design defects in the CONSERVE® product line generally, and as the cause of wear in Mr. Jarrett's device specifically, because "they are not based upon a reliable and scientifically valid methodology, are entirely speculative, and lack fit with this case." Dkt. 83 at 1. Plaintiffs have identified Dr. Jarrell as an "experienced multi-discipline engineer specializing in the analysis of complex designs and failures involving materials, mechanical and biological systems." Dkt. 88 at 2. Dr. Jarrell is a licensed Professional Mechanical Engineer dating back to 1996 and actively involved in engineering analysis, design, product development, and research. He graduated from Brown University with a B.S. and M.S. in Materials Science and Engineering and a Ph.D. in Biology, Medical Science and Engineering and has received medical training in histology, physiology, microbiology, and pathology. Dkt. 88-1.

In his report, based on his experience, training, education, review of Wright Medical Technology documents, FDA documents, published scientific literature and inspection and testing of over 100 Wright Medical hip implant components, Dr. Jarrell opines that Wright Medical's CONSERVE® hip system design is defective. Dr. Jarrell identifies Wright Medical's use of a large metal cup against a large metal ball for the articulating bearing surfaces as the major defect in the CONSERVE® hip system, which

in his opinion results in metal wear and the release of metal ions into surrounding tissues that can cause injury, or metallosis, as well as eventual cup loosening and device failure.

Dr. Jarrell also opines that Wright Medical's wear testing was inadequate in that it was performed "under ideal circumstances, which does not replicate patient use and clinical results" and failed to "identify the risks associated with exposure to cobalt and chromium metal wear debris, metal ions and corrosive products of [the] Conserve® product line in comparison to the traditional small metal head on poly design." *Id.* at 5. To support these conclusions, Dr. Jarrell's report sets forth results from wear testing he performed on CONSERVE® devices, from which he determined that 25% of the thirty-three (33) CONSERVE® hips he tested exhibited more wear than advertised, specifically 14 times more wear than anticipated. *Id.* at 21.

In reaching his specific causation opinions, Dr. Jarrell relied primarily on his review of Mr. Jarrett's medical records, particularly the report of Dr. Parr's observations during Mr. Jarrett's revision surgery. Because the CONSERVE® device explanted from Mr. Jarrett was not retained following the surgery and no photographs of the device could be located, Dr. Jarrell was unable to personally examine it for signs of wear and did not have the opportunity to photograph, microscopically analyze, or perform a visual analysis of the explant. Jarrell Dep. at 54–55. Instead, relying on Dr. Parr's observations of discolored tissue, pseudotumor, and osteolysis behind the cup of Mr. Jarrett's CONSERVE® device, Dr. Jarrell concludes that "[i]t is evident that metal ions and particles were released from wear and corrosion of the articular surfaces of the

12

[CONSERVE®] hip implant" and that, based on "the presence of metal on metal wear, that there was a loss of the fluid film formation between the ball and cup," which film the CONSERVE® device relies upon to "prevent metal on metal contact and wear under test conditions." Jarrell Report at 8.

Dr. Jarrell's report also states that it was "evident" from his review of Mr. Jarrett's medical records, based on indications of "tissue staining, grayish material surrounding the acetabular component, [and] fluid and cup loosening" that Mr. Jarrett "was exposed to cobalt and chromium metal wear debris, metal ions and corrosion products," and that such exposure "had a negative impact on the tissue surrounding" the CONSERVE® acetabular cup." *Id.* at 9. Dr. Jarrell further notes that Mr. Jarrett's medical records "reported a left hip pseudotumor related to metal on metal articulation with paraprosthetic osteolysis and major osseous defect," rendering it obvious that he "experienced metallosis to the tissues surrounding the cup implant and associated cup loosening and failure." *Id.* at 9.

### A.     General Causation Testimony

Wright Medical argues that Dr. Jarrell's general causation opinion concluding that all CONSERVE® devices are defective due to their metal-on-metal design should be excluded because it is not supported by any valid, scientific methodology. Specifically, Wright Medical claims that Dr. Jarrell's conclusion that the CONSERVE® device's design is defective because its large metal ball and cup component produces excessive metal wear is contradicted by: (1) well-established tribology principles set forth in the

13

scientific literature establishing that, for metal-on-metal devices, a larger diameter metal head actually creates a lower friction coefficient than a smaller head, and thus results in less wear, and (2) Dr. Jarrell's own testing, which showed that only 25% of the 33 CONSERVE® devices tested in his study demonstrated wear in excess of that advertised by Wright Medical, with the remaining 75% of the devices demonstrating wear levels at or below advertised levels.

     These objections by Defendant go to the weight rather than the admissibility of Dr. Jarrell's general causation testimony. Defendant has not challenged Dr. Jarrell's qualifications, which establish that he is an expert in the field of biomedical engineering and has expertise in "the scientific methods for testing and measuring wear" in implants. In that capacity, Dr. Jarrell is of the view that, while the scientific literature concludes that a larger diameter metal head is actually required for optimal performance of metal-on-metal implants, that conclusion is based on *in vitro* studies, which do not accurately represent the conditions encountered when the hip is implanted in a live patient. He claims that results from his testing of the CONSERVE® devices in which 25% of the devices showed 14 times more wear than expected support his conclusion that the CONSERVE® larger head design results in significantly more chromium and cobalt exposure than other hip systems due to excessive wear. In rendering these opinions, Dr. Jarrell relies on various studies and data, including surface area calculations, that are set forth in his report, and adequately explains the methodology employed in reaching his conclusions.

It is clear that Defendant and its experts disagree with Dr. Jarrell's general causation conclusions and believe that the results from his testing demonstrate errors in his analysis and opinions, but these areas relate to his credibility and the weight to which his testimony is entitled, which can be fully explored on cross-examination. "The question of whether the expert is credible or whether his or her theories are correct given the circumstances of a particular case is a factual one that is left for the jury to determine after opposing counsel has been provided the opportunity to cross-examine the expert regarding his conclusions and the facts on which they are based. It is not the trial court's role to decide whether an expert's opinion is correct." *Smith*, 215 F.3d at 718–19 (internal citation omitted). Here, Dr. Jarrell employed sufficiently reliable methodology in reaching his general causation opinions and his testimony is relevant and probative to the issues presented in this litigation. Accordingly, Dr. Jarrell's general causation opinions are admissible under *Daubert*. Wright Medical can challenge Dr. Jarrell's credibility and the content of his testimony on cross-examination or during the presentation of its own experts.

### B. Specific Causation Testimony

Wright Medical also seeks exclusion of Dr. Jarrell's specific causation testimony on grounds that his opinions are not scientifically derived, are unreliable for failing to consider potential alternative causes, and could be premised only on clinical medical issues outside of Dr. Jarrell's expertise. Because we agree with Defendant's first argument that Dr. Jarrell's specific causation opinions are inadmissible on that ground,

we shall not specifically address Defendant's latter two arguments in support of exclusion.

Dr. Jarrell has testified that his role as an engineer is to apply "scientific methods for testing and measuring wear" in implants and to "offer [an] opinion as to the most probable causes" of the issues encountered. Jarrell Dep. at 46. Here, however, the device explanted from Mr. Jarrett was not retained following the surgery and therefore could not be examined or tested by Dr. Jarrell. As a result, Dr. Jarrell has conceded that he does not know the amount of metal that was released by Mr. Jarrett's device or the amount of wear it showed relative to other devices. *Id.* at 58. Nor are there metal ion laboratory values specific to Mr. Jarrett that Dr. Jarrell was able to examine in reaching his conclusions. Accordingly, we find that Dr. Jarrell has not applied any reliable scientific methods for testing and measuring wear of Mr. Jarrett's device sufficient to support his conclusions as an expert in the field of engineering that Mr. Jarrett experienced metallosis and device loosening as a result of "wear and corrosion of the articular surfaces of the [CONSERVE®] hip implant." Jarrell Rep. at 9.

We acknowledge, as Plaintiffs argue, that Dr. Jarrell's testimony was deemed admissible in the lead MDL case, *In re Wright Med. Tech. Inc., Conserve Hip Implant Prods. Liab. Litig.*, 127 F. Supp. 3d. 1306 (N.D. Ga. 2015). However, in that case, Dr. Jarrell's report setting forth opinions regarding specific causation almost identical to those proffered here was based not simply on a review of the treating physician's surgical notes, but also multiple examinations and tests of the explanted devices. The MDL court

16

allowed Dr. Jarrell's opinions to be admitted on the basis that he had "twice examined [the] [p]laintiff's hip implant" using "visual inspection, photodocumentation, [and] microscopy wear measurements using a sensitive coordinate measuring machine." *Id.* at 1331. Dr. Jarrell testified in that case that his opinions on the release of metal particles were based on findings of "the loss of metal" determined from his examination of the explanted device. *Id.* at 1332. The MDL court therefore concluded that Dr. Jarrell's opinions regarding metal loss of the devices and resulting metallosis in the surrounding tissue were admissible because *his inspections independently showed* that "metal ions and particles were released from wear and corrosion of the articular surfaces" of the plaintiff's hip implant. *Id.* While the MDL court noted that Dr. Jarrell's conclusion was supported by the surgeon's post-operative observations, it focused on the fact that he reached his opinions "based on articulated evidence" gathered from his examinations and tests of the device. *Id.*

In contrast, here, as discussed above, Dr. Jarrell was retained by Plaintiffs as an engineering expert, yet his opinions that Mr. Jarrett experienced metallosis and device loosening are not based on evaluations of material loss or any other engineering testing. It is well-established that "[a]n expert's work is admissible only to the extent it is reasoned, uses the methods of the discipline, and is founded on data." *Higgins v. Koch. Dev. Corp.*, 997 F. Supp. 2d 924, 931 (S.D. Ind. 2014) (quoting *Long v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000)). Because Dr. Jarrell has not used engineering methods to test or examine the specific device that allegedly caused the

17

injuries in this case, his opinions do not pass muster under *Daubert*. *See In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 445–46 (S.D.N.Y. 2016) (excluding Dr. Jarrell's opinions as "not connected to the facts or issues in [the] case" because he drew conclusions from examinations of other devices and "did not do any testing on the specific [devices] that allegedly caused the injuries").

Accordingly, Defendant's motion to exclude the testimony of Dr. Jarrell is granted in part and denied in part. Dr. Jarrell may testify regarding his general causation opinions, but his specific causation opinions are excluded.

### III. Conclusion

For the reasons detailed above, Defendant's Motion to Exclude the Expert Testimony of John I. Waldrop, M.D. [Dkt. 80] and Motion to Exclude the Expert Testimony of John D. Jarrell, Ph.D., PE [Dkt. 81] are <u>GRANTED IN PART</u> and <u>DENIED IN PART</u> as set forth in this Entry. Defendant's pending motion for summary judgment shall be addressed in due course.

IT IS SO ORDERED.

Date: 3/26/2021

_Sarah Evans Barker_

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Brian K. Brake
THE MILLER FIRM LLC
bbrake@millerfirmllc.com

Anne A. Gruner
DUANE MORRIS LLP
AAGruner@duanemorris.com

Shayne Hodge
THE MILLER LAW FIRM, LLC
shodge@millerfirmllc.com

J. Scott Kramer
DUANE MORRIS LLP
jskramer@duanemorris.com

Eric Charles Lewis
LEWIS LEGAL SERVICES, P.C.
cmecf.lewislegal@live.com

Tayjes Shah
THE MILLER FIRM, LLC
tshah@millerfirmllc.com

Blake N. Shelby
FROST BROWN TODD LLC (Indianapolis)
bshelby@fbtlaw.com

Robert B. Thornburg
FROST BROWN TODD LLC
rthornburg@fbtlaw.com